IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

|  |  |  |
|---|---|---|
| SARAH R. GENTNER, | * | |
| | * | |
| Plaintiff, | * | |
| v. | * | Civil Case No. SAG-17-2493 |
| | * | *** UNDER SEAL *** |
| MARYLAND DEPARTMENT OF TRANSPORTATION, et al., | * | |
| | * | |
| Defendants. | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

Plaintiff Sarah R. Gentner ("Plaintiff") filed a Complaint against her former employer, Maryland Department of Transportation and Maryland State Highway Administration (collectively, "Defendants"), alleging disability discrimination, retaliation, and constructive discharge in violation of the federal Rehabilitation Act and its state analog, Md. Code Ann., State Gov't, § 20-606 *et seq.* ("Title 20"). ECF 1. Discovery is now concluded, and Defendants have filed two Motions: a Motion to Dismiss Plaintiff's Title 20 claims, ECF 38, and a Motion for Summary Judgment as to the Rehabilitation Act claims, ECF 41. I have reviewed the Motions, along with the oppositions, replies, and sealed exhibits filed by both parties. ECF 42, 47, 48, 49, 50, 53, 54, 55. No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2018). For the reasons that follow, Defendants' Motion to Dismiss the Title 20 claims will be granted, and their Motion for Summary Judgment will be granted in part and denied in part.

## I.    FACTUAL BACKGROUND

The facts are viewed in the light most favorable to Plaintiff, the non-moving party. Plaintiff began working as an engineer at the Maryland State Highway Administration in 2008. ECF 41-5 at 8:14-16. She steadily moved up the ranks and received merit increases to her pay.

*See* ECF 48-3. In February, 2014, Plaintiff received a promotion to the position of Transportation Engineer 5, working out of the District 3 Office in Greenbelt, Maryland, on the Engineering Systems Team ("EST"). ECF 48-2 at 20:13-21:8. The EST manages, directs, and administers projects, involving in house design teams and consultant engineers, who work on highway construction plans and contract documents for transportation projects in two of the largest and most populated counties in Maryland, with a number of high volume roads. ECF 41-11 ¶¶ 2-3. Plaintiff described the position by saying, "District 3 is very busy. The work is more fast-paced. There are shorter time schedules, so there's less room for adjusting things and making corrections or adaptations, in general." ECF 41-15 at 165:7-10. Plaintiff's original supervisors, upon her arrival in the position, were Karen Fiasco, Claudine Myers, and Kate Mazzara. ECF 41-11 ¶ 10. In the fall of 2014, Fiasco and Mazzara vacated their positions, and were replaced by Erica Rigby and Danielle Black. ECF 41-8 at 22:7-20 (stating Erica Rigby took over for Kate Mazzara).

Upon her arrival in 2014, Plaintiff carried a fairly light workload, because most existing projects were already assigned. ECF 41-11 ¶ 17. Her duties included "scoping the project, managing the budget of the project, scheduling for the project, consultant management for the projects, working with internal and external customers or assistance from other offices, public outreach." ECF 41-13 at 21:15-19. In the summer and fall of 2014, as Plaintiff's workload increased, her supervisors began noticing deficiencies in her performance, specifically in terms of punctuality and attendance, communication skills, interpersonal relationships, and use of time. ECF 41-11 ¶¶ 17-21; *see* ECF 41-19 (July 11, 2014 email from Claudine Myers to Plaintiff reminding her of call in procedures for absences/lateness "especially when you have scheduled meetings"); ECF 41-21 (Nov. 21, 2014 email from Claudine Myers to Plaintiff, "Again, I must stress that you need to turn in your leave slips for scheduled leave in advance of you taking leave.").

SHA issued revised "Guidelines for Approving SHA Timecards" on December 1, 2014, discussing the procedures approvers had to follow to ensure the timecards' accuracy. ECF 41-24. In particular, Myers became concerned about Plaintiff's absences, and created a spreadsheet to monitor her failure to follow call-in procedures in January, 2015. ECF 41-11 ¶¶ 22-25; ECF 41-25 at 92:21-93:5 ("So I started tracking in January because like you said, I gave her a meets standards for 2014, and if I needed to show a pattern, I would have to have had some kind of documentation, and at the time, the only person that failed to notify me of being late consistently was [Plaintiff]."). Between January and June, 2015, Plaintiff's supervisors had not been informed that Plaintiff suffered from any medical concerns. *See* ECF 41-6 at 35:10-16.

In April, 2015, Rigby and Myers met with Plaintiff to review her performance appraisal. ECF 41-11 ¶ 27. They discussed some of her performance deficiencies, but overall gave her a rating of "meets standards." *Id.* In that meeting, they discussed the importance of dependability and reliability in her position. *Id.* ¶ 28.

In July, 2015, Plaintiff submitted a Family and Medical Leave Act ("FMLA") request to SHA, asking to use intermittent leave to deal with flare-ups of her Bipolar II disorder and the side effects from her prescribed medication. ECF 48-6. SHA formally approved that request on July 17, 2015, granting intermittent FMLA for the period between June 23, 2015 and June 22, 2016. ECF 48-7. Plaintiff's supervisors were notified by email of the FMLA approval, and were advised that "the amount of FMLA leave used may be once a month for three to five days." ECF 41-11 ¶ 32. That same day, Myers notified the District Administrative Chief and Rigby that Plaintiff's typical use of leave was more sporadic, a few hours in the morning instead of a three to five day span. *Id.* At that time, Plaintiff's supervisors were not advised of the nature of her medical

condition, and were not told that her condition would impact her ability to follow standard call-in procedures for work absences. *Id.* ¶ 33.

In or around July 2015, Black began having one-on-one meetings with Plaintiff, and with the more junior engineer on the EST.[1]  ECF 41-11 ¶¶ 36-37.  On September 9, 2015, Plaintiff arranged a meeting with Myers and Black, during which she disclosed her diagnosis of Bipolar II. *Id.* ¶¶ 38.  Plaintiff did not mention anxiety disorder or panic attacks. *Id.* ¶¶ 40-41.  At the meeting, Plaintiff handed her supervisors a written list of her medical issues and concerns, including "decreased concentration," "[i]ncreased difficulty with memory and cognitive tasks," "[i]ncreased stress," "discomfort from lighting," and concern that her use of sick leave was being perceived as deficient performance.    ECF 41-11 Exh. B.  Plaintiff's list described several "proposed accommodations," including [f]lexible leave, more regular telework, modifying her workstation to a less distracting and quieter location, receiving work assignments in writing, and requests for concrete deadlines and more regular feedback. *Id.*  According to Plaintiff, Myers's immediate reaction was that the proposed accommodations were not feasible. ECF 48-11 ¶ 4 ("Ms. Myers simply dismissed it and stated that 'no, I don't think we can do that'").

After the meeting, Myers and Black conferred with Rigby about Plaintiff's request for accommodations. ECF 50-1 at 60:19-61:7. According to Plaintiff, at that point, she:

> was questioned about what I was doing during telework, even though prior to that
> point, I was allowed professional latitude to get the job done as necessary including
> what I worked on during telework.  Also, my time and attendance were scrutinized
> and questioned several times a week.  Even rote correspondence was micro-
> scrutinized and I was questioned about choice of words, who I emailed, and why I

---

[1] While Plaintiff now alleges that the private meetings with Black constituted an example of discriminatory hypervigilance, ECF 48-11 ¶ 20 ("the fact that I was singled out for one on one meetings, bothered me"), the evidence suggests that Plaintiff initiated the regular meetings. *See* ECF 41-74 (Plaintiff's email to Black on July 10, 2015 stating "I feel it would be beneficial to have regular one on ones with you on a biweekly basis.  Let me know how you would like to work this out.").

had not included or had excluded people from communications. I was berated for using abbreviations (e.g. castigated for using LED), and had my written communications picked apart. This also translated to verbal communications. There was not a day at work that I did not encounter Ms. Black, Ms. Myers or Ms. Rigby's scowling face, rolling of eyes when speaking to me, sighs of anger and frustration, raised voices, constant chastising, furtive glances as they spoke and laughed about me, hearing them speak about me in the office and laughing and mocking me, reprimanding me in front of my co-workers and the like.

ECF 48-11 ¶ 5.

With respect to Plaintiff's requested accommodations, in the view of her supervisors, allowing unscheduled and open leave would disrupt the operations of the EST, in light of its very limited staff and high volume of work. ECF 41-11 ¶ 42. For example, EST members have to perform project management duties on short notice, including "impromptu meetings, unscheduled office or site visits, and special assignments." *Id.*; *see also* ECF 41-14 at 44:17-45:7 ("Time and attendance is important because we need the people who are there who are managing our projects to be there to, you know, answer questions, to work with citizens, the public, construction, the various offices within the district, so if someone is not able to attend, it creates a work flow, a resource issue.").

Shortly after Plaintiff's meeting with Myers and Black, on September 25, 2015, Plaintiff made a formal written request for accommodations to Pamela Jenkins-Dobson in SHA's Office of Equal Opportunity. ECF 48-13. She provided supporting letters from her health care providers confirming her diagnosis of Bipolar II Disorder and its effects on her ability to concentrate, focus, and think. *Id.* One of Plaintiff's health care providers suggested several accommodations including "flexibility to make up lost time due to frequent absences within the regular work week," "flexibility to telework with limited notice," and "relocation of workstation to a more private, less distracting location." *Id.* at 4. Jenkins-Dobson contacted Plaintiff's health care providers for additional information, without first obtaining a release from Plaintiff. *See* ECF 50-3 at 48:21-

5

53:12. She also contacted the Job Accommodation Network, an association that provides guidance on reasonable accommodations. *Id.* at 44:3-46:21.

Plaintiff contends that after her disclosure of her disabilities, there was a concerted effort to ultimately get her fired by creating a performance issue. ECF 48-2 at 37:10-12 ("Once [Rigby] knew I had a disability, [] she was trying to, I guess, ultimately get me fired."). On October 14, 2015, Myers sent an email to the Division Chief of the Employee Services Division in SHA's HR department, inquiring whether the way in which Plaintiff used her intermittent FLMA leave, since July of 2015, had been "appropriate." ECF 48-14. On October 26, 2015, the Division Chief responded, opining that he did not believe her use of her intermittent leave was appropriate, and suggesting that Myers might consult Dr. Edwin Becraft, SHA's Chief of Medical Services, to find out whether Plaintiff's attendance, which was affected by her medical condition, could be viewed as a performance issue. ECF 48-16 (explaining that "use of FMLA ranging from 1-3 hour periods in the morning intermittently" was not appropriate). The Division Chief advised Myers to refer Plaintiff to SHA's medical advisor for evaluation even though "under normal circumstances a referral cannot be made when an employee is covered under the FMLA," but noting this might be "an extenuating circumstance and would be allowed." *Id.*

Ultimately, Rigby consulted with Dr. Becraft, who made the referral to the medical advisor for examination. ECF 48-20. Dr. Becraft also sent an email to the ADA Coordinator, HR, and others with the title "Seeking 10/27 Mtg for Complicated FMLA and ADA case" in which he advised that Plaintiff "is positioning herself to request ADA reasonable accommodation, probably including continued teleworking" and reminding everyone of the "potential for grievance." ECF 48-17.

On October 8, 2015, Plaintiff arrived late to work. ECF 48-18. On October 20, 2105, SHA issued a formal reprimand, citing Plaintiff's failure to use the correct call-in procedures. *Id.* Plaintiff appealed the discipline, and informed her supervisors that her medication side effects led to her inability to follow the standard procedures. ECF 48-19. SHA ultimately rescinded the discipline. ECF 41-11 ¶ 45.

On November 2, 2015, Plaintiff reached out to Jenkins-Dobson to inquire about the status of her accommodation requests. ECF 48-23. On November 3, 2015, she reminded Jenkins-Dobson by email that her ability to come in to work on time "fluctuates," and provided Jenkins-Dobson with various HR resources she believed to support her accommodation requests. *Id.*

On December 7, 2015, Plaintiff again arrived late to work, and SHA again began to administer discipline for her failure to adhere to call-in procedures. ECF 48-25. On December 11, 2015, Plaintiff submitted a "Statement of Mitigating Circumstances," explaining that disciplinary action would violate her rights under the FMLA. *Id.* Once again, the discipline process was halted, and no discipline was imposed. ECF 41-11 ¶ 46.

On December 10, 2015, Myers learned that Plaintiff had been approved for intermittent absences, two to three times per month, of one to three days each. *Id.* ¶ 47. Plaintiff and the ADA coordinator met in person to discuss the requested accommodations. ECF 41-44.

On December 21, 2015, Rigby ordered Plaintiff to submit to a mandatory workability examination with a MDOT Medical Advisor, as arranged by Dr. Becraft. ECF 48-26, ECF 48-27. Plaintiff's evaluation was assigned to Dr. Robert Toney, MD, who is affiliated with Concentra Medical Advisory Services. ECF 49-1. The referral told Plaintiff that the examination, scheduled for January 5, 2016, would "determine your medical fitness to consistently attend work and satisfactorily perform your full job duties." ECF 48-26. Prior to the examination, Dr. Becraft sent

Dr. Toney a cover memorandum describing Plaintiff as a poor performer and troublesome employee, and asked Dr. Toney whether Plaintiff can "be held accountable" for her performance. ECF 48-8.

Plaintiff attended the workability evaluation. ECF 49-1. Dr. Toney found that Plaintiff suffers from "Bipolar II Disorder" and "Anxiety Disorder," but recommended that she "continue to work regular activity at this time." *Id.* Dr. Toney referred Plaintiff to "a Neuropsychological Evaluation to better assess whether she is fit enough to perform her job duties from a psychological standpoint and whether she can be held accountable for her job performance and compliance with call-in procedures." *Id.* Dr. Toney then stated that he would see Plaintiff again in follow-up. *Id.*

On January 8, 2018, Rigby issued Plaintiff a memorandum to submit to another mandatory workability evaluation, four days later on January 12, 2016, with a third-party company called "Interdynamics, Inc." in Lanham, Maryland. ECF 48-30. As Dr. Toney had noted, the stated purpose of the examination was "to further evaluate your medical/psychological fitness to consistently attend work, satisfactorily perform your essential job duties, and comply with routine office policies." *Id.*

Plaintiff attended the examination, and met with Dr. Patricia Jenkins, Ph.D.  ECF 49-2. Dr. Jenkins administered a series of mental status examinations and tests, and took a thorough medical history. *Id.* Like Dr. Toney, Dr. Jenkins confirmed Plaintiff's diagnoses of "Bipolar II Disorder" and "Generalized Anxiety Disorder," in addition to depression and severe emotional distress. *Id.* at 13. Dr. Jenkins recommended that the SHA enact certain accommodations for Plaintiff's disabilities. *Id.*  For example, she recommended "that [Plaintiff] continue in her current position with revision of her work schedule to allow for 1-2 telework days per week, if this is feasible for her duties." *Id.* at 13.

On January 20, 2016, Plaintiff was informed that she would have a follow-up examination by Dr. Toney. ECF 48-32. She saw Dr. Toney again on January 27, 2016.  ECF 49-3 ("Follow-up Workability Evaluation").  Dr. Toney issued his report on January 29, 2016, confirming her disabilities and opining that Plaintiff could satisfactorily perform the essential duties of her position with the recommended accommodations, including:

> Revision of her work schedule to allow her one to two telework days per week if this is feasible with her duties.  It was recommended that if her current duties cannot be accomplished by teleworking, that reassignment to another position where she can do telework should be considered.  It was suggested that a modified work schedule is recommended to allow time for Ms. Gentner to attend her medical needs in the morning and avoid arriving late at work.  Given her relatively slow processing speed, it was recommended that Ms. Gentner receive extra time (within reason) to complete tasks involving visuomotor coordination such as graphic illustrations.  If extra time is not conducive to the nature of the task, assignments of task in smaller increments is recommended.

*Id.* Dr. Toney further noted, "it may not be reasonable to hold her accountable to compliance with call-in procedures because of unexpected side effects from her medications to treat her anxiety." *Id.*

Although Plaintiff's requested accommodations had not yet been formally acted upon, Plaintiff's supervisors enacted several changes voluntarily, including the relocation of her workspace.  *See* ECF 48-20 (Dec. 10, 2015 email, "It was determined that [Plaintiff] can modify her schedule to the extent that she can provide us with specific start times for each day that may have some variability.  She will also be moved to a more secluded location.").  On Monday, February 1, 2016, Plaintiff emailed Rigby, Myers, Jenkins-Dobson and others stating, "I just want to let you know that the relocation of my workspace is making a difference . . . In general it has made it much easier to stay focused for longer periods and spend less time having to refocus after being distracted.  I believe the change is better than I expected it to be.  Thank you."  ECF 50-4 at

30. Myers forwarded Plaintiff's email to Rigby and Black stating, "Too funny I think the 2 reprimands and the workability studies also help her refocus on what it takes to stay employed at SHA as well.  She really has been doing better in the corner, although I still seem to catch on her eye on occasion when walking into the room." *Id.*

> On February 3, 2016, Rigby emailed Jenkins-Dobson, stating:
>
> I just wanted to check in about the ADA accommodations for Sarah.  There has been no official response to her and she made a request about 6 months ago.  I do not think it is appropriate for the District to do a performance evaluation on her at this point.  For half of the year Sarah was functioning without appropriate support, which she has documented in the email below.  She has every right to contest even a meets standards because she could have been doing better had action been taken earlier.

ECF 48-34. On February 19, 2016, Jenkins-Dobson asked Rigby and an individual named Brian Young to "restate the troublesome proposed accommodations" that Plaintiff had sought. ECF 48-35.

On March 7, 2016, Jenkins-Dobson sent a letter to Plaintiff advising that some, but not all, of her requested accommodations had been approved, effective March 9, 2016. ECF 48-36. The two proposed accommodations that were denied were (1) the ability to telework on dates when Plaintiff could not make it to work and (2) flexibility to make up lost time due to any absences within the work week.  ECF 48-37. The next day, Plaintiff asked for reconsideration of those denials, but received no response. *Id.*

Overall, Plaintiff alleges that the six-month delay between her request for accommodation and the letter informing her of the accommodations being awarded consisted of "constant criticism, mocking, physical gestures indicating dislike and anger, [and] the relentless workability exams and questions." ECF 48-11 ¶ 14.:

Black, Myers, and Rigby were concerned that, because Plaintiff had worked in 2015 without all of the accommodations eventually granted to her in 2016, an accurate 2015 performance appraisal "would have resulted in [Plaintiff] falling below standards in several areas." ECF 41-11 ¶ 48. On March 25, 2016, Rigby emailed Plaintiff to state that, in lieu of a normal annual performance appraisal, SHA would provide her with a "Memo of Expectations," which appeared to be more of a performance improvement plan. ECF 48-38; ECF 48-39. Rigby stated that Plaintiff would not receive a performance appraisal, "since we spent considerable time working together to address changes in operations as a result of both your ADA accommodations and FMLA needs." ECF 48-38. However, Plaintiff requested a standard performance appraisal. ECF 48-40 at 2. Rigby forwarded Plaintiff's email to Dr. Becraft and the other SHA employees involved in the accommodation process stating, "All, please see below. This is Sarah's response. She does not want the memo [of expectations]. I asked her to come and speak to me in my office and asked what she wants. She wants a performance appraisal. So I'm just going to give her 3s down the line[,] sign it and give it to HR." ECF 48-40. On April 7, 2016, Plaintiff received a performance review indicating a ranking of "3," or "meets standards," in every metric. ECF 48-28.

On April 10, 2016, Plaintiff submitted a Memorandum to her supervisors, contesting her performance ratings and detailing the work she had performed in the past year. ECF 48-41 ("The purpose of this Memorandum is to provide a formal response to the Performance Appraisal you gave me on April 7, 2016."). Plaintiff contended that her work merited a higher rating. *Id.* She did not receive a response to her concerns, and her performance review was not altered.

Plaintiff has voiced complaints about several of her managers. For instance, describing Rigby, Plaintiff stated, "She was an extreme micro-manager. To me, she was very cold, did not –

11

would not give me a chance to speak a lot of the time.  She spoke over me or did not give me a chance to answer things.  I think she was hypervigilant of my work and had my supervisor be more hypervigilant of my work and my whereabouts, my leave usage .   When she dealt with me one-on-one, it was – there was always a negative tone; eye rolling.  She could be very short with me and at times, I would say, showed anger and frustration in her demeanor towards me."  ECF 41-16 at 36:13-20.   Plaintiff testified that Rigby behaved that way towards Plaintiff since the beginning of her time at District 3.  *Id.* at 38:1-9.  Describing Black, Plaintiff testified, "Ms. Black was hypervigilant with me, as well, and scrutinized – over-scrutinizing my work, calling me out in front of my peers, singling out my behavior.  Even though someone else may have done the same thing, I was treated differently."  ECF 41-17 at 42:21-43:4.

Plaintiff first applied for a position with Anne Arundel County in July or August of 2015.  ECF 41-58 at 204:1-2.  She interviewed with Anne Arundel County in July or August of 2016.  *Id.* at 5-8.  In the spring or summer of 2016, SHA selected Plaintiff for its Chief Engineer's Rotation Program, following her application for the detail. ECF 41-56.  Her detail was scheduled to begin in November, 2016. *See id.*  However, in September, 2016, Plaintiff told members of the EST that she had received a job offer with Anne Arundel County, and was negotiating her salary.  ECF 41-11 ¶ 50; ECF 41-58 at 204:8-15.  Roughly two months later, Plaintiff wrote a resignation letter to the District Engineer of SHA on November 2, 2016, in which she stated:

> Although I have very much enjoyed by time at SHA, I feel that I need to move on to a position that allows for more responsibility and professional career growth.  I was recently offered a position as Senior Engineer for Anne Arundel Department of Public Works, and unfortunately, it is not one I can decline, as the new job is the ideal next-step in my professional development.

ECF 41-57. Upon her departure, on November 18, 2016, Plaintiff emailed her coworkers, including Black, Myers, and Rigby, to say:

> Farewell SHA Family,  As some of you may know, today is my last day at SHA.  I will be taking an extended Thanksgiving Holiday and then starting at Anne Arundel Department of Public Works in December for the next step in my career.  It has been a pleasure working at SHA the last eight years.  I have grown so much.  Thank you for teaching and inspiring me, and allowing me to do the same for you.  I am deeply grateful for the knowledge, experience, and skills I have gained.  The experience has been highly rewarding and challenging, on both a personal and professional level.  I am sure all of it will help me in my new position.  I want you all to know that even though I am looking forward to this new challenge, I will miss my job and the incredible people I have had the pleasure of working with throughout the years.  I wish that my new job also provides me with great friends and colleagues like you.  I appreciate your support and understanding, and I wish you all the very best.  Thank you for the support, guidance, and encouragement you have provided me during my time at SHA.

ECF 41-1 Exh. C (alterations in formatting). Plaintiff began working for Anne Arundel County less than two weeks after her departure from SHA.  ECF 41-10 at 66:13-16.

## II.    MOTION TO DISMISS TITLE 20 CLAIMS

Defendants' Motion to Dismiss turns on a pure question of law: whether Plaintiff's Title 20 claims are barred by Eleventh Amendment immunity.   "[T]he ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court."  *Board of Univ. of Alabama v. Garrett,* 531 U.S. 356, 363 (2001); *Kimel v. Florida Board of Regents,* 528 U.S. 62, 72-73 (2001).  The Supreme Court requires "a clear declaration of the state's intention to submit its fiscal problems to other courts than those of its own creation" before a waiver of immunity from federal court jurisdiction is found. *Great Northern Life Ins. Co. v. Read,* 322 U.S. 47, 54 (1944).

The Maryland legislature passed a law consenting to suit under Title 20, which provides, "The State, its officers and its units may not raise sovereign immunity as a defense against an award in an employment discrimination case under this title."  MD. CODE ANN., STATE GOV'T § 20-903. However, a separate venue provision specifies that a Title 20 action "shall be filed in

the circuit court for the county where the alleged unlawful employment practice occurred." *Id.* §
20-1013(b).

Prior to June 11, 2019, judges in this Court had issued a series of decisions opining that the
Maryland legislature had consented to suit, and waived Eleventh Amendment immunity, for Title
20 lawsuits filed in either state or federal court. *See, e.g., Royster v. Gahler,* 154 F. Supp. 3d 206,
216-17 (D. Md. 2015); *Davenport v. Maryland,* 38 F. Supp. 3d 679, 690-91 (D. Md. 2014);
*Hartman v. Univ. of Md. at Baltimore,* Civil No. ELH-10-2041, 2013 WL 6858854, at *3-4 (D.
Md. Dec. 20, 2013).  However, on June 11, 2019, almost two years after the instant lawsuit was
filed, the Fourth Circuit decided *Pense v. Md. Dep't of Pub. Safety & Corr. Svcs.,* 926 F.3d 97 (4th
Cir. 2019).  In *Pense*, the Fourth Circuit ruled:

> Simply put, because the consent to suit provision does not "specify the State's
> intention to subject itself to suit in *federal court*," that provision cannot be read to
> waive the State's Eleventh Amendment immunity. *See Atascadero*, 473 U.S. at 241,
> 105 S.Ct. 3142. Moreover, neither the venue provision nor any other statute
> "expressly indicat[es] that the State['s] consent to suit extends to suit in federal
> court." *See Feeney*, 495 U.S. at 307, 110 S.Ct. 1868. Indeed, the Department relies
> on the venue provision — and its reference to solely "the circuit court for the county
> where the alleged unlawful employment practice occurred" — as evidence that the
> State's statutory waiver of sovereign immunity is unambiguously limited to suit in
> state court. We, however, need only decide this: In the absence of the State's
> "*express*[] consent to suit in *federal court*," the Department is entitled to the
> protection of the Eleventh Amendment with respect to Pense's FEPA claims. *See
> Allen*, 895 F.3d at 347.

Thus, under *Pense,* Plaintiff's Title 20 claims must be dismissed.

Recognizing that the current state of the law is unfavorable to her claims, Plaintiff urges
that this Court "place a stay on Ms. Gentner's Title 20 claims pending further action by the
Maryland legislature" or a possible appeal or request for re-hearing *en banc* after the final

14

disposition of *Pense* in the United States District Court.[2]  ECF 47 at 4.  However, all of those potential sources of a change in the law are entirely speculative. It is equally possible that the parties in *Pense* could settle their claims, or could simply decline to appeal the immunity issue further once the case is resolved.  Similarly, Plaintiff cites no authority for the need to stay a case pending a *possible* decision by the state legislature. Additionally, even if the Maryland legislature passes a bill expressly waiving the State's sovereign immunity from Title 20 claims in federal court, there is no basis to believe that such a waiver will be retroactive. Plaintiff's request for an indefinite stay of these proceedings, then, is unwarranted.  Ultimately, this Court must adhere to the binding precedent announced in *Pense,* and will dismiss Plaintiff's Title 20 claims in Counts III, IV, and V of the Complaint.

### III.    LEGAL STANDARD FOR SUMMARY JUDGMENT

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The moving party bears the burden of showing that there is no genuine dispute of material facts.  *See Casey v. Geek Squad*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)).  If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial.  *Id.*  The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial."  *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315-16 (4th Cir. 1993)).  The mere existence of a scintilla of evidence in

---

[2] *Pense* was considered by the Fourth Circuit last year in the posture of an interlocutory appeal. Because the claims were remanded, the case remains pending in the United States District Court. *See Pense v. Maryland Dept. of Public Safety and Correctional Servs.,* Civil No. 17-1791-PWG.

support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor. *Id.* at 348 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)). Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another." *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. *Id.* at 352. The non-moving party "must produce competent evidence on each element of [its] claim." *Id.* at 348-49 (quoting *Miskin*, 107 F. Supp. 2d at 671). If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Id.* at 352 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010) (unpublished)). In ruling on a motion for summary judgment, a court must view all of the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

## IV. ANALYSIS

Plaintiff brings three separate claims under the Rehabilitation Act: disability discrimination and retaliation, hostile work environment and retaliation, and constructive discharge.

### A. Disability Discrimination

Under Section 504 of the Rehabilitation Act, "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving

Federal financial assistance."  29 U.S.C. § 794(a).  To prove a case of disability discrimination under the *McDonnell Douglas* framework, a plaintiff must establish a *prima facie* case of discrimination, which requires evidence that (1) she is a member of a protected class; (2) her performance was satisfactory; (3) she suffered an adverse employment action; and (4) she was treated differently than similarly situated individuals outside her protected class.  *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973).  If the plaintiff does so, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions.  *See Abilt v. Central Intelligence Agency*, 848 F.3d 305, 315 (4th Cir. 2017). If that burden is met, the burden of production shifts back to the Plaintiff to produce evidence of pretext. *Id.*

Defendants' first argument is that Plaintiff was not a "qualified individual with a disability," because her condition rendered her unable to maintain adequate attendance and to concentrate and think to perform her job.  ECF 41-1 at 21-31.  Defendants' position is undermined by two facts: (1) the consistent opinions of Defendants' own medical evaluators that Plaintiff was capable of performing her position with appropriate accommodations; and (2) the evidence that Defendants themselves believed her to be qualified. Specifically, Defendants made representations, in Plaintiff's performance evaluations, that Plaintiff "meets expectations," and even selected Plaintiff for a detail in SHA's Chief Engineer's Rotation Tour in 2016.  As a result, Plaintiff has established a genuine issue of material fact as to her qualifications to perform the essential duties of her position, with or without accommodation.[3]

Defendants also contend that Plaintiff fails to establish an adverse employment action.  ECF 41-1 at 31–32.  However, Plaintiff's proffered evidence suffices to create a genuine issue of

---

[3] Although Plaintiff argues at some length to establish that she has a disability for purposes of the Rehabilitation Act, ECF 48 at 28-30, Defendants do not mount a meaningful challenge to that factor and this Court will not address it further.

material fact as to whether she suffered two distinct adverse employment actions. First, Plaintiff alleges that her disability was cited as a reason for failing to give her a standard employment evaluation, which can provide an employee grounds for receiving a merit bonus. ECF 48 at 22–23. *See Kirkland v. Mabus*, 206 F. Supp. 3d 1073, 1081 (E.D. Va. 2016) (finding no adverse employment action when the plaintiff received a "Fully Successful" rating, which entitled her to a performance bonus). The evidence cited above reflects that (1) Plaintiff's supervisors told her that because of her attendance issues and lack of accommodations during 2015, they did not believe they had sufficient information to give her a standard evaluation; (2) when Plaintiff insisted that she wanted an evaluation, her supervisor emailed other supervisors to say she would "just fill in all 3s;" (3) when Plaintiff contested the award of "all 3s," her supervisor failed to hold the conference that is generally held to discuss the merits of the evaluation. The Court notes that Plaintiff's eventual ability to establish any damages relating to this claim, even if liability is proven, is highly speculative. The "all 3s" evaluation does not meaningfully diverge from Plaintiff's evaluations in prior years, and Plaintiff's supervisors have stated that Plaintiff was not meeting their expectations as a result of her frequent absences and lapses in concentration, leading her to carry a significantly reduced work load as compared to similarly situated employees. *See, e.g.*, ECF 41-25 at 92–93. Thus, Plaintiff may not be able to establish that her supervisor's cursory and unprofessional handling of her performance evaluation caused her to be deprived of a merit bonus, or to suffer any other actual harm. Nevertheless, taking all facts in the light most favorable to Plaintiff, there is a genuine issue of material fact sufficient to defeat summary judgment on this claim.

Second, Plaintiff alleges a failure to promptly and adequately accommodate her disability.[4] The Court finds a genuine issue of material fact as to the appropriateness of the SHA's delay in granting or denying Plaintiff's requested accommodations, and the validity of the SHA's reasons for denying Plaintiff's requested flexibility in working from home and making up hours. Again, however, the evidence suggests that Plaintiff may have an uphill battle convincing a factfinder that she has any damages from any failure to accommodate, if one is found. Plaintiff continued in the same position with Defendants, without receiving any discipline or other form of adverse employment action, until she voluntarily resigned to accept a job that would pay her more money. Nevertheless, as described above, summary judgment is unwarranted, in light of the existing genuine issues of material fact with respect to her failure to accommodate claim.

### B. Retaliation

In *Dones v. Donahue,* 987 F. Supp. 2d 659, 671–72 (D. Md. 2013), the Court described the standards for a retaliation claim under the Rehabilitation Act:

> Under the Rehabilitation Act, to establish a *prima facie* case of retaliation, Plaintiff must show that: (1) he engaged in a protected activity, (2) his employer acted adversely against him, and (3) the protected activity was causally connected to the adverse action. *See Holland*, 487 F.3d at 218. As to the final prong, Plaintiff must prove "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas S.W. Med. Ctr. v. Nassar*, —— U.S. ——, 133 S. Ct. 2517, 2533, 186 L.Ed.2d 503 (2013). Unlike a discrimination claim, a plaintiff need not establish an "ultimate employment decision" to make out his *prima facie* case; rather, he must show only that the action would be seen as materially adverse through the eyes of a reasonable employee. *Burlington N.*, 548 U.S. at 68, 126 S. Ct. 2405. "'Although conduct short of ultimate employment decisions can constitute adverse employment action,' there still must

---

[4] While Defendants allege that Plaintiff did not include a failure to accommodate claim in her complaint, and while it was certainly not listed as a separate claim, a fair reading of her claim includes the failure to promptly and adequately accommodate her disability. *See, e.g.,* ECF 1 ¶ 136 ("The SHA's grant of partial accommodations went into effect exactly six (6) months to the day after [Plaintiff] first requested to her supervisors that she suffered from disabilities and needed accommodation, an egregiously unreasonable time period and which was not due to the result of a good faith, interactive, collaborative process.").

be a 'tangible effect on the terms and conditions of employment.'" *Geist v. Gill/Kardash P'ship*, 671 F.Supp.2d 729, 737 n. 6 (D. Md. 2009) (quoting *James*, 368 F.3d at 375). Actions like "petty slights, minor annoyances, and simple lack of good manners" are insufficient to support a retaliation claim, even under this lower standard. *Burlington N.*, 548 U.S. at 68, 126 S.Ct. 2405. Thus, an action is materially adverse if, from an objective point of view, "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.*

To satisfy the first element of her retaliation claim, Plaintiff relies primarily on her use of leave under the FMLA and her request for reasonable accommodations. ECF 1 ¶ 165–68. As to the second element, Plaintiff contends that she was subjected to "repeated acts of discipline" and was forced "to undergo three separate illegal workability evaluations." ECF 48 at 44. Even assuming *arguendo* that Plaintiff can demonstrate the second element of a prima facie claim, she fails to establish a causal connection between any adverse action and the protected activity. Most importantly, Plaintiff's medical documentation was not shared with other employees. *See, e.g.*, ECF 41-78 ([A]ll records and documents received during the FMLA process were treated as confidential medical records maintained in a separate medical file"). Although SHA initiated a disciplinary process after Plaintiff failed to leverage the call-in procedures, Plaintiff has not adduced evidence that her managers believed that her omission was connected to her use of FMLA. Rather, the uncontroverted evidence shows that Plaintiff did indeed fail to follow the required call-in procedures. And the Rehabilitation Act does not insulate an employee from discipline merely because she has engaged in protected conduct related to a disability. *Gasper v. Perry*, 155 F.3d 558, at *7 (4th Cir. 1998) ("[W]e have previously recognized that a handicapped employee is not protected from discipline or termination as a result of misconduct, even if that misconduct is related to the disability.").

With respect to the "three separate and illegal workability examinations," ECF 48 at 45, referral to the Medical Advisor (Dr. Toney) is a condition of employment for employees of the

20

Maryland Department of Transportation. The evidence demonstrates that Plaintiff was referred to Dr. Toney in order to determine whether Plaintiff could comply with job requirements, including the attendance policy. ECF 48-26. Indeed, after the initial referral, the subsequent referrals for a neuropsychological evaluation were made by Dr. Toney, not by SHA. Plaintiff has not adduced evidence that these evaluations were connected to anything but SHA's legitimate employment expectations. Accordingly, summary judgment is warranted for SHA on the retaliation claim.

### C.  Hostile Work Environment

Plaintiff's allegations do not establish a genuine issue of material fact as to the existence of a hostile work environment.  The elements of such a claim include: (1) that Plaintiff was subjected to unwelcome conduct, (2) that the conduct was based upon her disability, (3) that the conduct was sufficiently severe or pervasive to alter the conditions of employment and to create an abusive work environment, and (4) that the conduct is imputable to the employer.  *See Okoli v. City of Baltimore*, 648 F.3d 216, 220 (4th Cir. 2001).  The harassing conduct must be extreme, so as "to amount to a change in the terms and conditions of employment."  *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) (citations omitted).  "[C]omplaints premised on nothing more than rude treatment by [coworkers], callous behavior by [one's] superiors, [or] a routine difference of opinion and personality conflict with [one's] supervisor" do not suffice.  *Id.* at 315-16 (citations omitted).

Plaintiff's allegations, at best, fall into the latter category.  Plaintiff's allegations of hypervigilance, public criticism, and impolite treatment (like eye rolling and negative tone) might be rude, callous, and unpleasant, but do not amount to the type of extreme conduct needed to establish a hostile work environment. *See, e.g.*, *Bass v. E.I. DuPont de Nemours & Co.,* 324 F.3d 761, 765 (4th Cir. 2003) (finding a workplace dispute and "some perhaps callous behavior by her

21

superiors" insufficient for a plaintiff to establish severe or pervasive activity); *Khoury v. Meserve,* 268 F. Supp. 2d 600, 614 (D. Md. 2003) (determining that "disrespectful, frustrating, critical, and unpleasant" workplace interactions do not create a hostile work environment). Moreover, much of the conduct Plaintiff cites stems from the email exchanges amongst Plaintiff's three supervisors, which she first became aware of during discovery for this litigation. *See, e.g.* ECF 48 at 24 ("Pitifully, her supervisors created and encouraged the harassment and ridicule and went so far as to mock her disability and called her names like 'bum crumb.'"). While likely dismaying to Plaintiff to see some of the conversations that were going on behind her back, because Plaintiff was unaware of the contents during the course of her employment, those comments could not have contributed to her daily work environment.

Other than her citations to the emails discussed above, Plaintiff's allegations are general and do not describe particular incidents of harassing conduct. The Fourth Circuit has found that "general allegations" about a hostile work environment devoid of "accounts of specific dates, times or circumstances" are insufficient to survive a motion to dismiss a hostile work environment claim. *See Carter v. Ball*, 33 F.3d 450, 461–62 (4th Cir. 1994). Further, Plaintiff's own testimony is that the unpleasant treatment by Black and Rigby began when they arrived at EST, which predated her disclosure of her disability and her request for reasonable accommodations. *See, e.g.,* ECF 41-91 at 32: 8–15. Thus, both with respect to the nature of Plaintiff's allegations and the level of specificity, Plaintiff cannot establish the necessary severe and pervasive hostile environment required to sustain her claim, and summary judgment is appropriate as to Count Two.

###### D. Constructive Discharge

In Count V, Plaintiff alleges constructive discharge in violation of the Rehabilitation Act. To prove her claim of constructive discharge, Plaintiff must prove that her "working conditions [became] so intolerable that a reasonable person in [her] position would have felt compelled to resign." *Green v. Brennan*, 136 S. Ct. 1769, 1776-77 (2016). "'Unless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress.'" *Evans v. Int'l Paper Co.*, 936 F.3d 183, 193 (4th Cir. 2019) (internal citations omitted). The Fourth Circuit described the standard of "intolerability" as follows:

> "Intolerability" is not established by showing merely that a reasonable person, confronted with the same choices as the employee, would have viewed resignation as the wisest or best decision, or even that the employee subjectively felt compelled to resign… Instead, intolerability "is assessed by the objective standard of whether a reasonable person in the employee's position would have felt *compelled* to resign, that is, whether he would have had *no choice* but to resign.

*Id.* at 193.

Under that standard, even viewing the facts in the light most favorable to Plaintiff, there is insufficient evidence of objectively intolerable work conditions. Plaintiff argues in general terms about an "increasingly negative environment", ECF 48 at 25, and "intolerable working conditions," suggesting that SHA "wanted to rid [itself] of" Plaintiff, *id.* at 49. In fact, the uncontroverted evidence is that Plaintiff first applied for her new position in Anne Arundel County in 2015, before even informing her supervisors of her disability or requesting any accommodation. ECF 41-58 at 204:1-2. Once Plaintiff informed her supervisors that she had accepted a new position and was negotiating her salary with Anne Arundel County, she remained employed with Defendants for another several months. ECF 41-57; ECF 41-58 at 2:04 at 8-15. Upon her departure, Plaintiff made highly favorable comments about her supervisors and the work environment that she experienced at SHA. ECF 41-57; 41-1 Exh. C (stating "I am deeply grateful for the knowledge,

experience, and skills I have gained"). All of that conduct is patently irreconcilable with the level of objective "intolerability" required to establish constructive discharge, and summary judgment is therefore warranted.

**CONCLUSION**

For the reasons set forth above, Defendants' Motion to Dismiss the Title 20 Claims, ECF 38, will be GRANTED and Defendants' Motion for Summary Judgment will be GRANTED as to Counts II and V and DENIED as to Count I.  A separate Order follows, which includes information regarding a telephone conference to discuss a trial date.

Dated:  March 18, 2020                                         /s/
                                                      Stephanie A. Gallagher
                                                      United States District Judge